UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

v.  Case No. 8:24-cr-410-TPB-NHA

BRIAN KEITH ARCADIPANE,

    Defendant.
_____/

### ORDER DENYING DEFENDANT'S "MOTION TO SUPPRESS EVIDENCE AND OUT-OF-COURT STATEMENTS"

This matter is before the Court on Defendant's "Motion to Suppress Evidence and Out-of-Court Statements," filed by counsel on February 18, 2025. (Doc. 47). On March 18, 2025, the United States of America filed a response in opposition. (Doc. 54). On April 23, 2025, the Court held a hearing on the motion. (Doc. 59). After reviewing the motion, response, evidence, testimony, court file, and the record, the Court finds as follows:

### Background

The facts are largely undisputed. In April 2024, Matthew Coleman was the subject of an active federal investigation and had an active Florida arrest warrant for a violation of probation. Steven Hearth, a detective with the Polk County Sheriff's Office and a task force officer ("TFO") with the Federal Bureau of Investigation ("FBI"), was enlisted to assist in locating Coleman – he believed that Coleman was frequenting Defendant Brian Keith Arcadipane's residence.

During a meeting with Defendant, TFO Hearth informed him that Coleman was a fugitive and that if Defendant provided any aid to Coleman, Defendant could be criminally charged. TFO Hearth further advised Defendant to contact him if Coleman came to the residence, but Defendant never contacted him with additional information.

In July 2024, TFO Hearth received new information regarding Coleman from the Lake County Sheriff's Office – among other things, the Sheriff's Office informed TFO Hearth that Coleman was frequenting Defendant's residence. On July 25, 2025, officers responded to Defendant's home to look for Coleman and a woman named Cynthia Holder, who was also a fugitive. They received consent to search the home from Shauna Berry, a resident, but did not locate either fugitive.

On July 29, 2024, officers returned to Defendant's residence in yet another attempt to locate Coleman. This time officers with firearms surrounded the property and then began knocking at the door. When there was no response, officers eventually used a public address system on a patrol car to communicate with the occupants of the residence. In response, the occupants eventually exited the home – at this time, officers had their guns drawn for officer safety purposes since they did not know who would be exiting the residence. Officers patted down the occupants, but no one was handcuffed, detained, or arrested.

Defendant then gave consent to a search of the residence for Coleman.[1] Numerous officers entered the home, leaving only TFO Stephen Bonczyk with the five occupants. TFO Bonczyk had been talking with Defendant during the search, and Defendant offered to provide contact information for Coleman to assist law enforcement officers in their search. Defendant said he would need to access his phone, which was in the house. TFO Bonczyk agreed, and they entered the house to retrieve the phone from Defendant's bedroom.

In Defendant's bedroom, TFO Bonczyk observed a firearm, which Defendant claimed was a fake gun. Upon further inspection, TFO Bonczyk concluded that the firearm was a real gun and confronted Defendant, who conceded and admitted that the gun was real.

TFO Hearth arrived and questioned Defendant about the contents of a gun safe located within the master bedroom. TFO Hearth first asked if there were additional guns inside the safe, which Defendant denied. TFO Hearth and TFO Bonczyk then asked if there were illegal drugs inside the safe – although Defendant initially denied the presence of illegal narcotics, when asked if a pound of methamphetamine was inside the safe, Defendant stated that it was "not that much."

Defendant was placed in handcuffs and removed from the residence. He was originally charged with state criminal violations, including armed trafficking in

---

[1] TFO Bonczyk testified that Defendant consented to the search. Defendant chose not to testify at the hearing in this matter. As such, TFO Bonczyk's testimony is unrebutted on this point.

methamphetamine, possession of ammunition and a firearm by a convicted felon, possession of cocaine with intent to sell, and grand theft of a firearm. Defendant was transported to the PCSO Northwest District substation where he was read his *Miranda* warnings and made several admissions, including that he was provided with a firearm by Matthew Coleman, that he sells methamphetamine, and that he purchases methamphetamine to sell.

Defendant was ultimately indicted by a federal grand jury on four counts: conspiracy to possess with intent to distribute a controlled substance; possession with intent to distribute a controlled substance; possessing a firearm in furtherance of a drug trafficking crime; and possession of a firearm or ammunition by a convicted felon. He has moved to suppress the evidence obtained against him and his subsequent statements, arguing that he was illegally seized when commanded to exit his residence on July 29, 2024.

## Analysis

Under the Fourth Amendment, all persons have the right "to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court has generally interpreted this to mean that a search must be based on probable cause and must be executed pursuant to a warrant. *Katz v. United States*, 389 U.S. 347, 356-57 (1967). While some circumstances may allow searches and seizures without a warrant, the Fourth Amendment favors the use of warrants. *Illinois v. Gates*, 462 U.S. 213, 236 (1983)

(noting "the Fourth Amendment's strong preference for searches conducted pursuant to a warrant").

A search is reasonable when consented to, and consent does not need to be expressly given but may be fairly inferred from the totality of the circumstances. *Birchfield v. North Dakota*, 579 U.S. 438, 476 (2016); *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).  The prosecution bears the burden to prove that consent was freely and voluntarily given.  *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968).  "In evaluating the voluntariness of consent, a court 'should look at several indicators, including the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found.'" *United States v. Maddox*, 316 F. App'x 908, 913 (11th Cir. 2009) (quoting *United States v. Simms*, 365 F.3d 1347, 1355 (11th Cir. 2004)).

At the suppression hearing, TFO Hearth and TFO Bonczyk testified. Defendant did not testify.  Although Thomas Tomer testified on behalf of the defense, his limited testimony does not directly contradict the officers' testimony. Ultimately, the Court finds TFO Hearth, TFO Bonczyk, and Mr. Tomer to be credible witnesses.

After careful consideration, the Court finds that Defendant was not seized when officers asked him and the other occupants to voluntarily exit the residence. The Fourth Amendment is not implicated by an officer knocking upon a citizen's

door for legitimate police purposes. *See United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006); *see also United States v. Holmes*, 143 F. Supp. 3d 1252, 1258 (M.D. Fla. Nov. 11, 2015) (Corrigan, J.) (explaining that during a "knock and talk," officers may approach a house with or without probable cause to, for instance, "question the resident about possible criminal activity there or elsewhere, or try to obtain consent to search"). In this case, officers knocked on the door to investigate a wanted fugitive known to frequent that residence, then they asked the occupants of the residence to voluntarily exit, and the occupants complied. The officers did not physically intrude into the residence "with their voices," contrary to Defendant's contention, and officers are permitted to come to private property for the purpose of an investigation without intruding upon the Fourth Amendment.

But that does not necessarily end the Court's inquiry, as the Court must consider whether Defendant was seized at any other time during this encounter in a manner that would invalidate his consent to search. The officers initially had firearms pointed at the occupants as the occupants exited, and the officers conducted cursory pat downs for officer safety reasons. But the officers did not have firearms pointed at Defendant when they obtained consent to enter the residence to search for Coleman. After exiting the residence and during the search, Defendant and the other occupants were not handcuffed or otherwise detained. Instead, one officer remained outside with them while the others searched the residence. There is no evidence that officers threatened Defendant or coerced his consent – Defendant was cooperative with the officers and immediately agreed to their

requests. There is no evidence that Defendant ever expressed an objection to the officers' entry into the residence, and there is no evidence that he ever withdrew his consent.

Even if it is assumed for purposes of this analysis that the act of surrounding the home and ordering the occupants to come out was initially somewhat coercive, that does not necessarily negate an otherwise valid consent. "Factual situations involving a much greater show of force and restraints on suspects have not been found sufficiently coercive to invalidate consents to enter residences or to search." *United States v. Acosta*, 807 F. Supp. 2d 1154, 1179 (N.D. Ga. June 13, 2011). In fact, this case is similar to other cases in which consent was held to be voluntary *even when firearms were initially drawn. See United States v. Hidalgo*, 7 F.3d 1566, 1570-71 (11th Cir. 1993) (consent not invalidated although defendant was arrested by "SWAT team members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint"); *United States v. Garcia*, 890 F.2d 355, 360-62 (11th Cir. 1989) (concluding that consent was voluntary even after defendant was arrested by numerous officers, patted down for weapons, and a protective sweep of house was conducted); *see also United States v. Kimoana*, 383 F.3d 1215, 1225-26 (10th Cir. 2004) (affirming trial court's finding of consent where officers initially entered motel room with guns drawn and raised voices and conducted pat downs, but returned weapons to holsters and calmly asked for consent without any show of force); *United States v. Taylor*, 31 F.3d 459, 463-64 (7th Cir. 1994) (affirming trial court's finding of consent despite "initial melee of agents,

badges and weapons, necessary to protect the safety of the agents[,]" which dissipated after premises had been secured). Nothing about the events that occurred when officers initially made contact with Defendant – even with guns drawn – establishes that Defendant's later consent to search was involuntary.

In addition to the initial search, Defendant challenges the subsequent search of his bedroom by TFO Bonczyk. But Defendant voluntarily agreed to provide Coleman's contact information, which was located on his cell phone, and he agreed to retrieve the cell phone from his master bedroom with TFO Bonczyk. Once TFO Bonczyk was in the master bedroom and observed the gun, TFO Bonczyk was allowed to seize it under the plain view doctrine, which permits a warrantless seizure where "(1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent."[2] *See United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006).

Accordingly, the Court concludes that Defendant, the owner and/or resident of the house, voluntarily consented to law enforcement officers entering the residence to search for Coleman and to entering the residence with Defendant to retrieve Defendant's cell phone in the master bedroom. Because Defendant gave consent, officers were permitted to enter without a search warrant. The firearm seized was in plain view, and no warrant was required to seize it. That firearm

---

[2] Although TFO Bonczyk did not know at the time that Defendant was a convicted felon, TFO Bonczyk testified that when Defendant admitted that the gun was not a fake gun, Defendant stated that the gun should not have been in the house and was supposed to be disposed of already, and that Defendant was not supposed to have it in the house.

provided probable cause to support a further search of the bedroom, including the safe.

Finally, Defendant argues that his post-*Miranda* statements should be excluded. His only argument is that because he believes the searches were invalid because he did not give valid consent, anything that followed – including statements Defendant made before receiving *Miranda* warnings – were fruit of the poisonous tree and should also be excluded. But, for the reasons discussed above, the Court finds that both searches were valid under the Fourth Amendment based on Defendant's valid consent. Suppression of his statements is therefore not warranted on this basis.[3]

**DONE and ORDERED** in Chambers, in Tampa, Florida, this 1st day of May, 2025.

_____
TOM BARBER
UNITED STATES DISTRICT JUDGE

---

[3] Even if Defendant had argued another reason for suppression of the statements – for instance, that *Miranda* warnings were required – such argument would be unconvincing because Defendant was not in custody for *Miranda* purposes at the time of statements that he made at the residence. In any event, after Defendant was taken into custody and to the police station, he received *Miranda* warnings, so any post-*Miranda* statements would also be admissible.